**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

LORI F. GUSTAFSON,

        Plaintiff,

    vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

No. CIV S-06-2816-CMK

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 25) and defendant's cross-motion for summary judgment (Doc. 26).

/ / /

/ / /

/ / /

/ / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on April 12, 2002.  In her application, plaintiff claims that disability began on February 12, 1999.[1]  In a Disability Adult Report submitted with her application, plaintiff stated:  "I have been diagnosed as having fibromyalgia (FMS) which causes my muscles, tendons, and nerves to hurt all the time."  As a result of fibromyalgia, plaintiff stated that she cannot "walk, sit, or stand for any length of time."  Plaintiff did not claim disabling mental impairments.[2]

Plaintiff's claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on February 20, 2003, before Administrative Law Judge ("ALJ") Laura Speck Havens.  In her April 17, 2003, decision, ALJ Havens made the following findings:

1.  The claimant met the disability insurance requirements of the Act on October 1, 2000, her amended onset date of disability and continues to meet them through at least the date of this decision; the claimant has not engaged in substantial gainful activity (SGA) since October 1, 2000;

2.  The medical evidence establishes that the claimant suffers from fibromyalgia which is a "severe" impairment but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4;

3.  The claimant's allegations of disabling pain are not credible for the reasons given in the rationale portion of this decision;

4.  The claimant has the ability to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally, sit for 6 hours in an 8-hour workday, and stand and/or walk for 6 hours in an 8-hour workday;

5.  The claimant has relevant work experience as a paralegal, public safety supervisor/security guard, and as a group home supervisor/recreational aide. . . .;

---

[1]     At her first administrative hearing, plaintiff amended her alleged onset date to October 1, 2000.

[2]     However, she apparently argued at her third administrative hearing that she was also disabled as a result of anxiety and depression.  In her motion for summary judgment, plaintiff does not raise arguments concerning anxiety or depression, but claims that the ALJ erred with respect to her cognitive ability.

6.     The claimant is able to perform . . . all of her past work; this finding is supported by the testimony of the vocational expert; and

7.     The claimant was not under a "disability," as defined in the Social Security Act. . . .

Plaintiff sought review by the Appeals Council which issued a decision on June 24, 2003, remanding the case for further consideration by the ALJ.  Specifically, the Appeals Council stated:

The decision did not address the written statements of the claimant's partner and mother which were entered in the record as Exhibit 2E.  In accordance with 20 C.F.R. 404.1513(e)(2) and 416.913(e)(2) and Social Security Rulings 96-7p and 97-8p, the Administrative Law Judge is required to consider a lay witness's impressions of a claimant.

A second hearing was held on September 18, 2003, before ALJ Havens.  In her March 18, 2004, decision, ALJ Havens made the same findings and denied benefits.  The Appeals Council again granted plaintiff's request for review on June 28, 2004.  In its order, the Appeal Council stated:

This case was previously remanded for further consideration of the third party statements in Exhibit 2E.  The current decision reports the statement from the claimant's partner but does not provide a credibility finding.  The decision does not mention the statement from the claimant's mother that is also a part of Exhibit 2E.  In addition, the record also contains an evaluation from a CMT who reported spasms and multiple trigger points and advised the claimant to seek treatment for possible fibromyalgia in 1999 (Exhibit 2F, page 16).

In accordance with [the regulations, social security rulings, and caselaw], the Administrative Law Judge is required to consider all the lay witness' impressions of a claimant.  If the Administrative Law Judge wishes to discount the statements of lay witnesses (s)he must give reasons that are germane to each witness.

The Appeals Council directed that the case be remanded and assigned to a different ALJ.

/ / /

/ / /

/ / /

/ / /

3

A third administrative hearing was held on June 8, 2005, before ALJ William C. Thompson, Jr.  In his September 20, 2005, decision, ALJ Thompson made the following findings:

1.    The claimant met the insured status requirements of the Act on February 12, 1999, the date the claimant stated she became unable to work, and continued to meet them through March 31, 2002;

2.    The claimant has not performed substantial gainful activity since February 12, 1999;

3.    The medical evidence establishes that the claimant has fibromyalgia, but that she does not have an impairment, or combination of impairments, listed in or equivalent in medical severity to one listed in, Appendix 1, Subpart P, Regulations No. 4;

4.    The allegations of the claimant, her friends, and her mother are not credible;

5.    The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work, except:  she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; she can stand/walk up to 2 hours in a workday; she cannot climb; she can stoop, bend, twist, squat, kneel, and crawl occasionally; she cannot operate foot controls; she must avoid heights and moving machinery;

6.    The claimant's past relevant work as a secretary and investigator did not require the performance of work-related activities precluded by the above limitations;

7.    The claimant's impairments do not prevent the claimant from performing her past relevant work;

8.    The claimant's residual functional capacity for the full range of sedentary to light work is reduced by the following limitations:  She can stand/walk up to 2 hours in a workday; she cannot climb; she can stoop, bend, twist, squat, kneel, and crawl occasionally; she cannot operate foot controls; she must avoid heights and moving machinery;

9.    The claimant is 43 years old, which is defined in the regulations as a "younger individual";

10.    The claimant has a 12th grade education;

11.    Transferability of acquired skills is not material to this decision;

12.    If the claimant had the residual functional capacity to perform the full range of light work, given her age, education, and work experience, [the regulations] would direct a finding that the claimant is not disabled;

13.   If the claimant had the residual functional capacity to perform the full range of sedentary work, given her age, education, and work experience [the regulations] would direct a finding that the claimant is not disabled;

14.   Although the claimant's additional nonexertional limitations do not allow her to perform the full range of light work, using the above cited rule(s) as a framework for decisionmaking, there is a significant number of jobs in the national economy that she could perform. . . ; and

15.   The claimant was not under a "disability" . . . at any time through the date of this decision.

After the Appeals Council declined further review on September 14, 2006, this appeal followed.

Several months after the completion of briefing on the pending cross-motions for summary judgment, plaintiff submitted a document indicating that, subsequent to the agency decisions at issue in this case, the agency issued a favorable disability decision.  Specifically, plaintiff states:

Ms. Gustafson['s] last Appeals Council Decision was 9/14/06.  TR. 8.  She filed an application for SSI, as procedurally appropriate, on 11/13/06 and, therefore, Res Judicata would not apply.  On 4/25/08 a Social Security Administrative Law Judge determined that Ms. Gustafson had the following severe impairments:  fibromyalgia and chronic back pain.  Further, the ALJ determined that she has been under a disability since 11/13/06, the date of her application.

Plaintiff asks that the court consider the April 25, 2008, decision, which she attaches to her filing, in the context of the pending cross-motions.  She states:

The issues in the case before the court was [sic] the same as were before the ALJ, including the issue of credibility.  As such, Ms. Gustafson requests this 4/25/08 decision be admitted as probative and relevant, that this case be reversed and remanded for payment of benefits.

As to credibility, the most recent decision discusses only plaintiff's statements, which were found to be "generally credible."  It does not appear that the ALJ made any specific findings in the recent decision regarding the credibility of lay witness statements.

/ / /

/ / /

/ / /

5

1    Defendant opposes plaintiff's request that the court consider the 2008 ALJ

2    decision.  Defendant argues that, while the court may consider new evidence, it may only do so if

3    the new evidence is material to the time period for which benefits were denied.  See Mayes v.

4    Massanari, 276 F.3d 453, 462 (9th Cir. 2001).  Defendant concludes that, because the 2008

5    decision relates to a different time period than at issue in the instant case, it is not material and

6    should not be considered.

7        The court agrees.  In particular, the ALJ concluded in the 2008 decision that

8    ". . . the claimant was disabled as of November 13, 2006. . ." whereas ALJ Thompson's

9    decision – which is the subject of this action – was issued in September 2005 and became final in

10   September 2006.  The 2008 decision recognizes that it addressed a completely different time

11   period:

12           The decision on the claimant's prior Title 11 and Title XVI applications is
             not being reopened and reviewed because the current application was not
13           filed 2 years from the date of the notice of initial determination for the
             prior Title XVI claim (citations omitted). . . .  Accordingly, the previous
14           decision is final and binding.

15   In addition, as defendant notes, the 2008 decision addressed plaintiff's claim of disability based

16   on fibromyalgia and back pain.  The instant case, however, does not involve a specific claim of

17   back pain.  Thus, the most recent decision concerns a different set of impairments and evidence

18   concerning back pain not previously considered.  Therefore, the court will not consider the 2008

19   ALJ decision granting benefits except insofar as portions of it are summarized above.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

## II. SUMMARY OF THE EVIDENCE

A.   **Physical Impairments**

The certified administrative record ("CAR") contains medical records from the following sources concerning plaintiff's physical impairments:

1. Records for the period October 1999 through August 2002 from Atwater Medical Group (CAR 215-29, Ex. 2F);

2. Records covering the period November 1999 through March 2004 from Sutter Gould Medical Group (CAR 294-301; Ex. 10F);

3. Records for the period February 2002 through April 2002 from Aspen Family Medical Group (CAR210-14, Ex. 1F);

4. Report dated June 22, 2002, by Michael Y. Han, M.D., of Medical Analysis, Inc.,  (CAR 263-264, Ex. 4F);

5. Treatment notes dated July 23, 2002, by Vance Roget, M.D. (CAR 272-73, Ex. 5F);

6. Physical residual functional capacity assessment dated September 23, 2002, by agency consultative physician (CAR 231-238, Ex. 3F);

7. "Subjective Assessment" dated October 2002 by Kathleen Adams, CMT of the Soft Tissue Therapy Clinic (CAR 230, Ex. 2F);

8. Source statement dated January 23, 2003, by Christina G. Tazwell, M.D. (CAR 271, Ex. 5F);

9. Report dated February 18, 2003, by Eric C. Disbrow, M.D., of Atwater Medical Group (CAR 275-76, Ex. 6F);

10. Report dated October 30, 2003, by Amit Rajguru, M.D. (CAR 285-90, Ex. 9F);

11. Report dated March 12, 2004, by Paul Schunke, M.D., of Sutter Gould Medical Group (CAR 316, Ex. 11F);

12. Report following November 4, 2004, examination by agency examining doctor Paul D. Casner, M.D. (CAR 320-24; Ex. 12F);

13. Physical residual functional capacity assessment dated November 16, 2004, by agency examining doctor Paul D. Casner, M.D. (CAR 317-19; Ex. 12F);

14. Report dated June 4, 2005, by Juanita Vierra, R.N. (CAR 325-26; Ex. 13F); and

15.     Report dated March 13, 2006, by Patrick N. Rhoades, M.D. (Car 348-49).

<u>1999 – 2001</u>[3]

Records from Atwater Medical Group dated January 12, 2000, and January 23, 2000, indicate diagnoses of fibromyalgia and chronic pain.  Plaintiff was seen at Atwater on March 23, 2000, at which time fibromyalgia was again diagnosed.  Atwater progress notes from December 2000 indicate that plaintiff is "having a lot of pain – fibromyalgia."  These notes also indicate anxiety.  Progress notes from June 2001 reveal that plaintiff was taking Xanax, presumably for anxiety, and Vicodin for pain.  The notes also repeat the diagnosis of fibromyalgia, but do not indicate anxiety.  The notes also indicate that plaintiff is "unable to sit prolonged."  Atwater notes from November 2001 indicate that plaintiff was provided refills of her prescriptions for Xanax and Vicodin and a continuing diagnosis of fibromyalgia.

<u>2002</u>

Records from Aspen Family Medical Group from the period February through April 2002 indicate a diagnosis of fibromyalgia.  They also show plaintiff's medications.  Specific entries indicate:

> Was diagnosed with fibromyalgia from other doctors; wants diagnosis continued.  Has anxiety disorder.  Has trouble sleeping.
>
> Multiple trig. pts.; panic attacks.

These records do not reveal any objective findings.

On June 22, 2002, Michael Y. Han, M.D., reported on his physical examination of plaintiff.  His examination results revealed full range of motion in all planes of the cervical spine and no tenderness to palpation.  Dr. Han did, however, note "bilateral upper paracervical trigger points in the upper neck and shoulders."  Spurling's test was negative bilaterally.  Plaintiff also

---

[3]     While the index to the CAR indicates that records from Atwater Medical Group cover periods in 1999, the court cannot locate any records from that year and none are referenced by plaintiff in her motion for summary judgment.

had full range of motion of the upper extremities with only mild tenderness in her posterior upper shoulders.  Motor strength was 5/5.  As to plaintiff's lumbosacral spine, Dr. Han did not note any tenderness to palpation, but he did observe trigger points which caused considerable discomfort.  Plaintiff had full range of motion in the lower extremities and motor strength was 5/5.  Dr. Han noted moderate tenderness to palpation over the anterior lateral legs and feet, but no signs of swelling or edema.  Dr. Han's diagnosis was "[f]ibromyalgia or other chronic pain syndrome, not otherwise specified."  Dr. Han offered the following assessment:

> It is clear from the history and physical examination that the claimant has a complex pain syndrome most likely due to fibromyalgia.  Therefore, her limitations are completely based on her subjective symptoms based on her pain syndrome.  Again, her subjective complaints would appear appropriate to limit her ambulating to only six hours per day as well as her standing to only six hours per day.  She is limited in her lifting and carry to only 20 pounds occasionally and 10 pounds frequently.
>
> However, from an orthopedic standpoint there does not appear to be any organic pathology which would give her any restrictions in her physical activity. . . .

Plaintiff was seen by Vance Roget, M.D., on July 23, 2002.  Dr. Roget's notes indicate that plaintiff was laid off seven years earlier and has applied for social security benefits based on permanent disability.  The doctor's notes also indicate that plaintiff stated she had "chronic anxiety" for which she took Xanax and had counseling.  The results of physical examination were essentially normal.  Dr. Roget's impression following his physical examination was fibromyalgia and "multiple associated conditions, caused & continued by her self-generated chronic stress reaction."  As to her functional capabilities, Dr. Roget's notes indicate that, when he saw plaintiff in 2002, she was working part time and that she could do full-time sedentary work.  Plaintiff was scheduled to return for another visit in August 2002, but later cancelled saying she wouldn't return to see Dr. Roget.

/ / /

/ / /

/ / /

9

On September 23, 2002, an agency consultative doctor prepared a physical residual functional capacity assessment. The doctor concluded that plaintiff could lift up to 20 pounds occasionally and ten pounds frequently and stand, sit, and/or walk for about six hours in an eight-hour day. Her ability to push/pull was unlimited. No postural, manipulative, visual, or limitations were found.

The record contains a document prepared by massage therapist Kathleen Adams bearing an October 29, 2002, date stamp. Ms. Adams states that she initially treated plaintiff on October 1, 1999, for severe pain in both feet and chronic fatigue. She saw plaintiff again on October 30, 1999. Ms. Adams states:

> In my Objective Assessment, I noted limited flexibility of both Lori's feet indicating shortening of the plantar fascia. I also noted inflammation along Lori's thoracic and lumbosacral regions of her spine along with moderate to severe pain at multiple trigger points. Lori's erector spinae muscles were inflammed, spasming and palpated tender on both R and L sides. Inflammation and tenderness was noted long the IT band and tensor fascia latae on both R and L sides. Also noted inflammation and hypertonicity of muscles in cervical region both anterior and posterior sides.

Ms. Adams advised plaintiff to "seek necessary medical care and diagnosis of her symptoms."

<u>2003</u>

In January 2003, Christina G. Tazwell, M.D., prepared a brief report as follows:

> Lori comes in. She was a former patient of mine six years ago. She is seeing a physician in Atwater. She now has a diagnosis of fibromyalgia and he has her on Vicodin one tablet every four hours. I explained to her that is not my treatment for fibromyalgia and I would not be able to prescribe that, and so I have suggested that since she has been on it for two years and is somewhat committed to it that she seek help . . . from a pain specialist as her primary care physician. She has agreed to this concept and will only return to us if she is tapered from Vicodin.

In February 2003, Eric Disbrow, M.D., wrote a letter to plaintiff's attorney regarding plaintiff's condition and functional limitations. He indicated a diagnosis of fibromyalgia based on "diffuse tenderness to palpation of her back, shoulders, and extremities, and pressure points that are more tender in these areas." He stated that plaintiff's fibromyalgia,

in conjunction with resulting depression and anxiety, "make it difficult for her to function in any

setting including household chores." As to her ability to work, Dr. Disbrow stated:

> She would have difficulty doing full-time work. She can function for about an hour at a time before she has to rest and this would have to be a job that had no physical as well as mental stress. Because of her pain, soreness, depression, and anxiety, she would have trouble with a job that required a lot of mental concentration. As far as her functional residual capacity, she would have trouble lifting repetitively ten pounds over her head during an eight-hour work day. She would have trouble . . . staying in one position either sitting or standing several hours a day and would be unable to sit for six hours a day or stand for two hours a day. She would have difficulty repetitively doing any job that involved pushing or pulling and would be unable to crouch, crawl, or do repetitive reaching or stooping.

On October 30, 2003, Amit Rajguru, M.D., prepared a report following a physical

examination of plaintiff. Dr. Rajguru did not note any abnormalities. He diagnosed anxiety and

fibromyalgia pain syndrome. As to plaintiff's functional capacity, Dr. Rajguru stated:

> Based on my examination today the patient does have some limitations in her functional status due to her fibromyalgia syndrome. Even though there are a lack of objective findings she has significant records corroborating her diagnosis of fibromyalgia. Specifically, the patient can lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit for six hours out of an eight hour work day and stand and walk for about six hours in an eight hour work day. Otherwise she has no major postural, manipulative, visual, communicative, or environmental limitations.

### 2004

On March 12, 2004, Paul Schunke, M.D., of Sutter Gould submitted a letter

regarding plaintiff's medical condition stating:

> Lori Gustafson was seen March 12, 2004, in rheumatology consultation. She has a five year history of musculoskeletal pain consistent with a diagnosis of fibromyalgia, with characteristic areas of soft tissue tenderness on examination consistent with that diagnosis.

The record reflects that Dr. Schunke performed a physical examination which revealed

essentially normal findings, although Dr. Schunke did note tender points characteristic of

fibromyalgia. Dr. Schunke opined that "some of her back pain may be on a mechanical basis

related to overweight." Dr. Shcunke concluded his report with the following comment:

> She has had usual therapies prescribed for fibromyalgia and I can offer no change in her regimen. She was advised to attempt mild aerobic exercise even if this causes discomfort.

On November 4, 2004, agency examining physician Paul Casner, M.D., performed a comprehensive internal medicine evaluation of plaintiff. Dr. Casner provided the following diagnoses:

> 1.   Myalgias and fatigue consistent with fibromyalgia syndrome, with incomplete pharmacological control of pain;
>
> 2.   Pain in the feet consistent with plantar fasciitis by history; and
>
> 3.   Depression and generalized anxiety, with incomplete pharmacological control of symptoms.

His functional assessment was as follows:

> The number of hours that the claimant could be expected to stand and walk cumulatively in an eight-hour workday is about four hours, limited by pain in the back and fatigue.
>
> The number of hours that the claimant could be expected to sit in an eight-hour work day, with breaks every two hours, is without restriction.
>
> The claimant requires no assistive device.
>
> The amount of weight that the claimant could lift and carry would be 10 pounds frequently and 20 pounds occasionally.
>
> Postural limitations include occasional forward bending, stooping, squatting, kneeling, and crawling due to myalgia.
>
> There are no manipulative limitations to reaching, handling, feeling, grasping, or fingering. Overhead reaching is limited to occasional, due to myalgias of the neck and shoulder girdle.
>
> Environmental limitations include limited walking distance and stairs due to pain in the feet and general fatigue.

On November 16, 2004, Dr. Casner completed a residual functional capacity assessment consistent with the foregoing.

/ / /

/ / /

12

1    <u>2005</u>

2    Registered nurse Juanita Vierra submitted an evaluation of plaintiff's condition on

3    June 4, 2005.  Ms. Vierra provided the following recommendations:

> Lori has extensive functional and structural holding patterns that
> contribute to her myofascial and fibromyalgia pain.  Due to the structural
> imbalances in her pelvis and shoulder girdle walking long distances and
> standing for extended periods would be difficult for her.  The restrictions
> in her shoulder girdle limit her range of motion and ability to lift objects.

> This evaluation was based on a visual examination of Lori's
> posture and body usage, palpation of her body for areas of hypotonicity, as
> well as her inability to lift her left arm during the pectoral stretch.

<u>2006</u>

Patrick Rhoades, M.D., submitted a report  on March 13, 2006.  He states that

plaintiff first came to him in September 2005 with complaints of diffuse body pain "from head to

toe, front to back" for about four to five years.  Dr. Rhoades reported the following regarding his

initial examination:

> On our initial physical exam we saw an overweight, middle aged
> female.  She had tenderness at every fibromyalgia tender point.  She had
> normal sensation without weakness and normal reflexes.  It was my
> feeling at that time that she had fibromyalgia syndrome, given the fact that
> all of her fibromyalgia tender points were painful to palpation and she
> described history of chronic diffuse pain that affected her body from top to
> bottom and front to back. . . .

He added that plaintiff exhibited "basically the same symptomatology" on subsequent

examinations.  Dr. Rhoades agreed with prior diagnoses of fibrromyalgia and added that he

thought plaintiff also had chronic low back degenerative disc disease.  He also stated that

plaintiff had mild depression but "not . . . much in the way of cognitive difficulty."  As to

plaintiff's functional capabilities, Dr. Rhoades stated:

> I believe she is limited in her ability to perform a job.  I do not
> think she can do even sedentary work given the fact, or the description, of
> the pain that she has.  If it is indeed true, and I believe that it is, she is
> completely disabled at this point in time.  I cannot believe that she would
> do any better with different medications nor do I believe that she would
> benefit going back to work because of her pain.  She has had pain that has
> been going on for four to five years, but I cannot attest to how much pain

1   she had previously.  I do know that when she saw us in 09/08/05 she was
2   having significant neck pain and could not perform the work.

3   **B.     Mental Impairments**[4]

4          The CAR contains medical records from the following sources concerning

5   plaintiff's mental impairments:

6          1.     Report of June 17, 2002, examination by Laurie Weiss, Ph.D. (CAR 265-
7                 68, Ex. 4F);

8          2.     Psychiatric review technique form dated July 2002 by agency consultative
                  doctor Danilo Lucila, M.D. (CAR 244, Ex. 3F);

9          3.     Assessment dated July 18, 2002, by agency consultative doctor Sandra D.
10                Battis, M.D. (CAR 247, Ex. 3F);

11         4.     Psychiatric review technique form dated September 23, 2002, by agency
                  consultative doctor (CAR 239-43, Ex. 3F);

12         5.     Report dated August 13, 2003, by Philip J. Verderame, M.D. (CAR 278,
13                Ex. 7F); and

14         6.     Report dated November 19, 2003, of October 21, 2003, examination by
                  psychological assistant Jacklyn Chandler and approved by Dr. Weiss
15                (CAR 279-84, Ex. 8F).

16         2002

17         A psychological disability evaluation was performed by agency examining doctor

18  Laurie R. Weiss, Ph.D., on June 17, 2002.  As to her present illness, the doctor reported:

19         The claimant reported having extreme pain most of the time due to
20         fibromyalgia.  She also reported having chronic anxiety and depression.
           She stated that she has been experiencing anxiety for approximately 17
21         years and she also stated that she has been experiencing depression ever
           since she has had fibromyalgia.

22  / / /

23  / / /

24

25         [4]     As noted above, plaintiff did not claim disabling mental impairments in her initial
26  application.  However, because she has since argued impairments relating to anxiety, depression,
    and/or cognitive ability, the court will address records relating to mental impairments.

Plaintiff told Dr. Weiss that she had not worked since February 1999 due to pain associated with fibromyalgia. As to anxiety and depression, Dr. Weiss noted the following reported by plaintiff:

> . . .[W]hen [plaintiff] takes her Xanax regularly, she does not experience any anxiety. She also takes Paxil, which she states contributes to controlling her anxiety. It also helps her depression. The trazodone helps her sleep. Her prescribing doctor is Dr. Disbrow.
>
> When asked for symptoms of depression, the claimant could not report any. A checklist of symptoms of depression was gone through and the claimant answered in the negative to all symptoms of depression.

Dr. Weiss offered the following impressions following her examination and testing:

> In today's evaluation, the claimant reported depression and anxiety, though she stated that her medication controls her symptoms of anxiety fully. When she was asked about symptoms of depression, she could report none. A thorough evaluation of her symptoms of depression was made and overall she did not meet the criteria for any depressive disorder as defined by the DSM-IV-TR. Therefore, no diagnosis was made. Cognitive testing indicated that she is functioning overall in the low average range with no significant deficits noted in any area.
>
> In today's evaluation, the claimant was able to understand, remember, and carry out simple, detailed, and complex instructions. [¶] She was able to maintain concentration, persistence, and pace for the duration of the evaluation. [¶] She was able to endure the stress of the interview and the testing process itself. [¶] She was able to interact appropriately with this examiner. [¶] She demonstrated the cognitive ability to manage her finances should funds be granted.

On July 11, 2002, agency consultative doctor Danilo Lucila, M.D., completed a psychiatric review technique form in which the doctor concluded that there was no medically determinable mental impairment.

On July 18, 2002, agency doctor Sandra Battis, M.D., prepared a disability evaluation. She concluded that plaintiff's impairments were not severe.[5]

///

---

[5] The doctor does not specify whether this opinion relates to plaintiff's physical or mental conditions. However, given that other agency consultation documents clearly indicate that plaintiff has fibromyalgia, it appears that this assessment relates to plaintiff's mental problems.

On September 23, 2002, an agency consultative doctor completed a psychiatric review technique form.  The doctor noted an anxiety-related disorder which was not severe.  As to restrictions of activities of daily living, difficulty maintaining social functioning, and difficulty maintaining concentration, persistence, and/or pace, the doctor concluded that plaintiff was only mildly impaired.

2003

On August 13, 2003, Phillip J. Verderame, M.D., provided a letter to plaintiff's attorney which stated:

> I treated Ms. Gustafson from 03-10-95 to 07-20-99.

> Her presenting complaint was:  "I'm very anxious.  I have a scared feeling, overwhelmed and stressed."  At that time, March of 1995, her Mental Status Exam revealed an INTELLIGENCE of:  "average to above."

> Though I am NOT a Psychiatrist using Standardized Objective Testing and am No longer treating her, I recommend repeating "IQ Testing" and an MMPI to assess her current condition.

Psychological assistant Jacklyn Chandler performed an evaluation on October 21, 2003.  Plaintiff reported to Ms. Chandler that she had not worked since October 1999.  As to mental impairments, plaintiff described the following symptoms:  "sleep disturbances, appetite fluctuation, lack of energy, lack of interest in doing things she once enjoyed, and nervousness."  She reported that her current medications control her anxiety and depression symptoms.  Plaintiff also reported that she is able to perform activities of daily living, such as washing dishes, doing laundry, cooking, and going grocery shopping unattended.  Ms. Chandler's final impressions were the same as reported by Dr. Weiss in June 2002.

/ / /

/ / /

/ / /

/ / /

/ / /

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues:  (1) the ALJ improperly rejected the opinions of her treating physicians; (2) the ALJ improperly rejected the credibility of third-party and lay witness testimony; (3) The ALJ failed to consider her decreased cognitive ability as evidence of fibromyalgia; and (4) hypothetical questions posed to the vocational expert did not accurately reflect plaintiff's exertional and non-exertional limitations.

A.    **Evaluation of Medical Opinions**

Plaintiff appears to argue that the ALJ erred in rejecting her treating physicians' opinions that plaintiff's fibromyalgia precluded even sedentary work.  Specifically, she points to Dr. Disbrow's assessment that plaintiff's functional rating is "less than sedentary" and Dr. Rhoades' opinion that plaintiff could not do even sedentary work, conclusions which the ALJ rejected.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

1   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

2   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

3   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

4   without other evidence, is insufficient to reject the opinion of a treating or examining

5   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

6   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

7   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

8   see also Magallanes, 881 F.2d at 751.

9                As to Dr. Disbrow, the ALJ stated:

10           On February 18, 2003, Eric C. Disbrow, M.D., of the Atwater Medical
             Group, stated that he had diagnosed fibromyalgia.  Physical pain,
11           depression, and anxiety which made it difficult for the claimant to
             function.  Dr. Disbrow stated that the treatment for the claimant's illness
12           was antidepressants, antianxiety drugs, muscle relaxants, and pain pills.
             Dr. Disbrow stated that the claimant would have difficulty performing full-
13           time work.  The claimant would be unable to sit for six hours a day or
             stand for two hours a day.
14
                                           * * *
15
             Dr. Disbrow's medical records contain very few medical findings.
16           (Exhibit 2F).  Most treatment notes contain only the claimant's complaints
             and Dr. Disbrow's diagnosis.  Dr. Disbrow is not a specialist, and has
17           never referred the claimant to a specialist.  He did not refer the claimant
             for any kind of therapy or alternative treatment.  Therefore, I give little
18           weight to his assessment.

19   Dr. Rhoades' report was submitted after the decision was issued in September 2005, but before

20   the Appeals Council declined further review in September 2006.  Therefore, while the report was

21   not addressed by the ALJ, it was part of the record reviewed by the Appeal Council.  (see CAR

22   11).   Given that the Appeals Council declined further review, it must have felt that Dr. Rhoades'

23   opinion was not entitled to any weight.

24   ///

25   ///

26   ///

1          Initially, the court notes that plaintiff's argument indicates her belief that the ALJ

2   rejected these doctors' underlying diagnosis of fibromyalgia.  In particular, plaintiff states in her

3   motion for summary judgment:  "There was *unanimity* in the *treating* and *evaluating* physicians

4   that Lori *suffers from Fibromyalgia*."  (emphasis in original).  It is not the case, however, that the

5   ALJ rejected this diagnosis.  In fact, the ALJ concluded that the record establishes that plaintiff

6   does indeed have fibromyalgia.  Therefore, the court will focus on whether the ALJ properly

7   rejected these doctor's conclusion that plaintiff could not do even sedentary work due to her

8   fibromyalgia symptoms.

9          The record is clear that the opinion of Drs. Disbrow and Rhoades is contradicted.

10  Specifically, all of the other doctors who either examined plaintiff or reviewed her records

11  concluded that plaintiff could do at least sedentary work.  Therefore, the ALJ must provide

12  specific and legitimate reasons for rejecting the conclusion that plaintiff cannot do sedentary

13  work.  In this case, the court finds that the ALJ has satisfied this burden.  The ALJ outlined all of

14  the medical findings, including the opinions of Dr. Disbrow (which was later shared by Dr.

15  Rhoades) and all the other doctors.  Notably, every doctor whose evaluations and conclusions

16  were accompanied by objective testing data concerning plaintiff's functional abilities concluded

17  that plaintiff could perform activities consistent with at least a sedentary level of full-time work.

18  Dr. Han concluded in January 2002 that plaintiff's ". . .subjective complaints would appear

19  appropriate to limit her ambulating to only six hours per day as well as her standing to only six

20  hours per day" and that plaintiff ". . .is limited in her lifting and carry to only 20 pounds

21  occasionally and 10 pounds frequently."  Dr. Roget concluded in July 2002 that plaintiff could do

22  full-time sedentary work.[6]  The agency consultative doctors agreed.

23  / / /

24  / / /

25  ――――――――――――――

26        [6]     After Dr. Roget reached this conclusion, plaintiff never returned for further
    treatment from this provider.

1    **B.**    <u>**Credibility**</u>

2         Plaintiff claims that the ALJ erred in rejecting the credibility of statements

3    concerning the disabling level of plaintiff's pain.  Specifically, she argues:

4              The ALJ again denies this case based on a credibility finding
         without any basis.  He discounts Ms. Williamson's letters stating because
5         Lori lives with her and she pays her bills, Ms. Williamson has a
         "pecuniary interest" in the outcome of the Hearing.  He gives no basis for
6         discounting the mother's letter. . . .  Th[e] credibility finding by the ALJ
         has no basis in fact.  Both Lori's treating and evaluating sources are
7         unanimous in the diagnosis of Fibromyalgia.  Her treating physician, Dr.
         Disbrow, states she is unable to work due to her pain.  TR. 275.

8

9    The Commissioner determines whether a disability applicant is credible, and the court defers to

10   the Commissioner's discretion if the Commissioner used the proper process and provided proper

11   reasons.  <u>See</u> <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding

12   must be supported by specific, cogent reasons.  <u>See</u> <u>Rashad v. Sullivan</u>, 903 F.2d 1229, 1231 (9th

13   Cir. 1990).  General findings are insufficient.  <u>See</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir.

14   1995).  Rather, the Commissioner must identify what testimony is not credible and what

15   evidence undermines the testimony.  <u>See</u> <u>id.</u>  Moreover, unless there is affirmative evidence in

16   the record of malingering, the Commissioner's reasons for rejecting testimony as not credible

17   must be "clear and convincing."  <u>See</u> <u>id.</u>; <u>see also</u> <u>Carmickle v. Commissioner</u>, 533 F.3d 1155,

18   1160 (9th Cir. 2008) (citing <u>Lingenfelter v Astrue</u>, 504 F.3d 1028, 1936 (9th Cir. 2007), and

19   <u>Gregor v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006)).

20        If there is objective medical evidence of an underlying impairment, the

21   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

22   because they are unsupported by objective medical evidence.  <u>See</u> <u>Bunnell v. Sullivan</u>, 947 F.2d

23   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in <u>Smolen v. Chater</u>:

24             The claimant need not produce objective medical evidence of the
         [symptom] itself, or the severity thereof.  Nor must the claimant produce
25        objective medical evidence of the causal relationship between the
         medically determinable impairment and the symptom.  By requiring that
26        the medical impairment "could reasonably be expected to produce" pain or

another symptom, the <u>Cotton</u> test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See <u>Bunnell</u>, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See <u>Smolen</u>, 80 F.3d at 1284 (citations omitted).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See <u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

Regarding credibility, the ALJ stated:

> Whenever an individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  Social Security Ruling SSR 96-7p and the regulations at 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements.  Relevant factors include daily activities; location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate pain and other symptoms; and other factors concerning functional limitations and restrictions due to pain and other symptoms.

/ / /

/ / /

/ / /

The ALJ then summarized the relevant statements by plaintiff and third-party sources as follows:

> On May 17, 2002, the claimant stated that on an average day, she got up, had something to drink, and then lay down again because of severe pain. She could vacuum and wash dishes for short periods of time. She read the newspaper every day, and was able to remember what she read. She had no difficulty getting along with others. She tried to work after she became ill, but could not because of severe panic attacks. (Exhibit 1E, pp. 13-18).

> On May 17, 2002, Darlene Williamson, the claimant's partner, stated that the claimant cooked about once a week. Most of the time, the claimant was in too much pain to drive. The claimant liked to watch TV, paint ceramics, and read the newspaper. The claimant had severe panic attacks due to the pain. (Exhibit 1E, pp. 19-24).

> On August 23, 2002, the claimant stated that . . . her condition had worsened. She was only semi-comfortable in bed. She could not sit or stand for any length of time. She could not remember short-term. She had difficulty getting out of the bathtub after showering or bathing. (Exhibit 1E, pp. 3-8).

> On September 14, 2002, the claimant stated that her pain began on August 22, 1998. She had pain everywhere, all day, every day. Medication only relieved her pain for three hours. The only position that relieved her pain was to lie flat on her back on top of her heating pad. (Exhibit 1E, pp. 9-11).

> On February 5, 2003 Gwen Reno, the claimant's mother, stated that the claimant had a job as Head of Security at Memorial Hospital. After seven years or so, the claimant's energy level began to decline. The claimant complained of sore feet and ankles. Dr. Disbrow finally diagnosed fibromyalgia and advised the claimant, "This is a life long condition with no approved treatment or cure." The claimant was prescribed heavy painkillers, sleep inducers, and muscle relaxers. The claimant's health deteriorated. The claimant was unable to walk more than a few steps at a time. The claimant was totally dependent on medication to get through each day. The claimant was unable to perform normal household duties. (Exhibit 2E, p. 2).

> On February 10, 2003, Ms. Williamson stated that she had known the claimant for six years. The claimant had had a successful career and was making something of herself in the Law Field. Four years previously, the claimant had found she had fibromyalgia, which totally destroyed her life. Pain medication barely took the pain away. The claimant was lucky to get two to three hours of sleep at night. Most of the time, the claimant was in so much pain she slept off and on all day long. When the claimant sat up, she was in so much pain within an hour that she had to lie down. (Exhibit 2E, p. 1).

///

On February 25, 2002, the claimant stated that she became unable to work on February 12, 1999.  She had to give up her job as a security officer because she could not be walking all the time or even part time.  (Exhibit 1E, pp. 44, 51).

The ALJ then discussed various inconsistencies in the statements.   The ALJ offered the following specific analysis based largely on plaintiff's testimony that her pain symptoms began in August 1998:

If the claimant was working as a security officer in 1999, she worked very little.  The claimant earned $538.05 in 1998 and $793.28 in 1999.  (Exhibit 2D).  If her fibromyalgia caused her to stop working as a security officer in 1999, it seems odd that she was only able to earn $538.05 in all of 1998.  According to the claimant's own statements, she had no symptoms prior to August 1998.

The claimant told Dr. Weiss in June 2002 that she had last worked for three months as a security officer.  If that is so, she was not earning very much money, as she only earned $793.28 in all of 1999.  The claimant told Dr. Weiss that she had worked seven months prior to that as a clerical worker.  Apparently, she did not earn much in that job, either.  That job apparently predated her symptoms, as the claimant has alleged several times that she stopped working less than six months after her symptoms began.  The claimant did not work at all in 1996, and only earned $3,051.38 in 1997.  The claimant's fibromyalgia could not have been the cause for this meager work activity, as she did not suffer any symptoms until 1998.

The claimant's mother [Gwen Reno] stated that the claimant had had a job of Head of Security.  After seven years or so, the claimant's energy began to decline, and Dr. Disbrow diagnosed fibromyalgia.  The claimant last worked full time in 1995, according to her record of earnings.  The claimant stated that she had stopped working as Head of Security in December 1995.  (Exhibit 1E, p. 32).  It appears that the claimant might have stopped working in order to pursue paralegal training, as she obtained a paralegal certificate in March 1997.  (Exhibit 3E).  The claimant's mother stated that the claimant's position as Head of Security was cut short by her illness.  The claimant's partner stated that it was the claimant's legal career that was cut short by her illness.  These two statements are contradictory, given the claimant's work history.

The claimant's partner [Darlene Williamson] stated that the claimant had had a successful career and was making something of herself in the Law Field.  The claimant stated that she worked only two months in 1997 as a paralegal.  (Exhibit 1E, p. 45).  The claimant's disability could not have been the cause of her stopping work, as she stated that her symptoms did not begin until August 22, 1998.  Two months' work as a paralegal is difficult to define as "making something of herself in the Law Field."

> The claimant stated that she worked from October 1997 through December 1997 for the Bureau of Missing Persons. She stated that she was paid $1,500 per month. (Exhibit 1E, p. 43). The claimant's pain that began August 22, 1998, could not have caused her to stop working in this job. The claimant then got a job with a temporary service. Contrary to the statements of the claimant's friend and mother, the claimant's sporadic work history since 1995 was not due to her disability.

The ALJ then commented on plaintiff's failure to heed the advice of her doctors regarding management of her pain symptoms:

> At the supplemental hearing on June 8, 2005, the claimant testified that she weighed 210 pounds. She had gained 50 to 60 pounds because she got no exercise. If the claimant has gained 50 to 60 pounds, she must have gained all that weight before January 2000, as the claimant weighed 226 pounds in January 2000. If the claimant gets no exercise, she is obviously not following medical advice. Dr. Roget prescribed specific home exercises. Atwater Medical Group prescribed back exercises. Dr. Schunke advised the claimant to get aerobic exercise, even if it caused discomfort. Apparently, the claimant has not followed any of this medical advice.

> The claimant sought treatment from Dr. Roget, a specialist in rehabilitation. After one visit, the claimant never returned. Dr. Roget wanted to taper the claimant off Vicodin, as did Dr. Tazwell. Dr. Tazwell told the claimant that if she were committed to taking Vicodin, she should seek treatment from a pain management specialist. There is no indication that the claimant has ever done so.

Finally, the ALJ discussed the statements concerning plaintiff's alleged mental limitations:

> Although the claimant and her friend both stated that the claimant suffered severe panic attacks because of pain, the medical records do not support this allegation. The claimant told Dr. Weiss that medication controlled her panic attacks. When Dr. Weiss went through a depression symptom checklist with the claimant, the claimant could not come up with any symptoms of depression. The claimant has never sought treatment from a mental health professional.

The ALJ ultimately assigned ". . . little credibility to the claimant's subjective allegations and to the statements of the claimant's mother [Gwen Reno] and Ms. Williamson." The ALJ felt that, "[f]rom the treatment records, it appears that the claimant sought treatment from several of her care providers to bolster her claim for disability rather than for relief of her symptoms." Finally,

/ / /

/ / /

as to Ms. Williamson, the ALJ observed:

> . . . I also note the claimant's testimony at the supplemental hearing that
> Ms. Williamson paid all her living expenses; therefore, Ms. Williamson
> has a pecuniary interest in the outcome of this matter.

For several reasons, the court finds that the ALJ's credibility determinations are supported by substantial evidence. First, Dr. Roget noted in July 2002 that, at the time, plaintiff was working part time, which contradicts plaintiff's later statement that she stopped working in 1999. Dr. Roget opined that plaintiff could do full-time sedentary work. Plaintiff cancelled her next appointment and never returned for further treatment from Dr. Roget. This suggests to the undersigned, as it did to the ALJ, that plaintiff only sought treatment from Dr. Roget in order to bolster her disability case, and not for his expertise and advice regarding her treatment and rehabilitation.

Second, plaintiff told Dr. Weiss in 2002 that she last worked in February 1999, but told Ms. Chandler in 2003 that she last worked in October 1999. And, as just discussed, plaintiff told Dr. Roget in 2002 that she was working part time. Obviously, these statements are inconsistent.

Third, plaintiff did not report any symptoms of depression when Dr. Weiss examined plaintiff in 2002 and went through a checklist of symptoms. However, in 2003 plaintiff reported to Ms. Chandler almost all of the checklist symptoms of depression. As discussed in more detail below, this suggests fabrication of symptoms in 2003.

Fourth, for the reasons discussed by the ALJ, the statements from Ms. Williamson and Ms. Reno concerning the cause of plaintiff's sporadic work history are inconsistent. For example, Ms. Reno stated that the plaintiff's position as Head of Security was cut short by her illness, while Ms. Williamson said that it was the claimant's legal career that was cut short by her illness. These statements are contradictory and neither can be correct. Plaintiff stopped working as Head of Security in 1995 and she stopped working as a paralegal in 1997. Based on plaintiff's testimony that fibromyalgia symptoms did not first manifest until August 1998, her illness could

1   not have been the cause of either job being "cut short."

2          Fifth, plaintiff did not follow the medical advice of her doctors regarding

3   management of her pain.  Specifically, she was advised to exercise but apparently did not do so.

4   In addition, she was advised to see a pain management specialist if she wished to continue the

5   use of Vicodin.  While the record reflects continuous use of Vicodin, it does not reflect treatment

6   by a pain management specialist.  One would expect that an individual suffering from disabling

7   pain would follow the advice of her doctors.  The court agrees with the ALJ's assessment that,

8   based on the treatment records, it appears that plaintiff was more interested in bolstering her

9   disability case than in managing pain symptoms in order to return to work.

10          Finally, Dr. Rhoades reported that he first saw plaintiff in September 2005 for

11  diffuse body pain "from head to toe, front to back" which had been occurring for about four to

12  five years.  Thus, according to the history plaintiff provided to Dr. Rhoades, her pain symptoms

13  began, at the earliest, in September 2000.  This obviously contradicts plaintiff's  testimony that

14  her pain symptoms began in August 1998 and that she stopped working in 1999 due to

15  fibromyalgia pain.

16          While it is clear that plaintiff suffers from fibromyalgia and experiences pain as a

17  result of ths condition, plaintiff has not credibly established that her pain is disabling.  Of

18  particular note are the following:  (1) plaintiff has not followed the advise of her doctors with

19  respect to pain management; (2) plaintiff worked part-time in 2002 – three years after the alleged

20  onset of fibromyalgia pain symptoms in 1998; and (3) the inconsistency between the 1998 onset

21  date alleged in her testimony and the 2000 onset date reported to Dr. Rhoades.

22          **C.      Plaintiff's Cognitive Ability**

23          Plaintiff argues that "cognitive dysfunction over time can be considered 'signs' of

24  Fibromyalgia . . ." and that the "ALJ made legal error . . . in completely discounting the nearly 30

25  point drop in IQ score since the onset of Fibromyalgia."  In particular, plaintiff points to Dr.

26  Verderame's conclusion when he first treated plaintiff in 1995 that her intellectual functioning

1   was "average to above average" and contrasts this with findings after plaintiff's alleged 1998

2   onset date of cognitive ability in the "low average range."  It appears that the gravamen of

3   plaintiff's argument is that the ALJ failed to consider this change in intellectual functioning over

4   time as evidence that plaintiff suffers from fibromyalgia.  The hearing decision, however, makes

5   clear that, whether based on decreased intellectual capacity or on other evidence, the ALJ

6   concluded that plaintiff is impaired by fibromyalgia.

7   　　　　　Moreover, plaintiff does not point to any evidence that a decrease in cognitive

8   ability is directly related to fibromyalgia.   Dr. Verderame concluded plaintiff's cognitive ability

9   was "average to above average" in 1995.  According to plaintiff, her fibromyalgia symptoms

10  began in 1998.  Dr. Weiss and Ms. Chandler concluded in 2002 and 2003 that plaintiff's

11  cognitive ability was in the "low average range."  It is possible that the decrease in cognitive

12  ability occurred between 1995 and 1998 and, therefore, is not attributable to fibromyalgia.

13  　　　　　Finally, the court observes that plaintiff does not argue that the ALJ erred by not

14  including mental impairments – such as depression, anxiety, or cognitive dysfunction – in his

15  residual functional capacity assessment, nor could she.  While the record includes evidence that

16  plaintiff was diagnosed with mental problems, plaintiff's own statements reveal that these

17  problems were controlled by medication.  Additionally, as to plaintiff's allegations of depression,

18  it is noteworthy that plaintiff could not point to any symptoms when provided a depression

19  checklist by Dr. Weiss in 2002, but listed nearly all the checklist symptoms to Ms. Chandler in

20  2003.  At best for plaintiff, this suggests that depression symptoms arose after 2002 and, thus,

21  could not have been related to fibromyalgia pain which began three years earlier.  At worst for

22  plaintiff, this suggests that plaintiff manufactured her symptoms as reported in 2003 based on her

23  experience with Dr. Weiss in 2002.

24  / / /

25  / / /

26  / / /

1          **D.    Hypothetical Questions**

2                  Hypothetical questions posed to a vocational expert must set out all the

3  substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

4  Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

5  limitations, the expert's testimony as to jobs in the national economy the claimant can perform

6  has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

7  the ALJ may pose to the expert a range of hypothetical questions, based on alternate

8  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

9  determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

10  Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

11                 Plaintiff argues:  (1) the ALJ failed to reflect the opinions of her treating

12  physicians in his description of plaintiff's residual functional capacity; and (2) the ALJ failed to

13  include any limitations posed by non-exertional mental impairments in his hypothetical

14  questions.  For the reasons discussed above, the court rejects these arguments.  In particular, the

15  ALJ properly rejected the conclusions of the treating doctors in favor of the conclusions of the

16  agency examining and consultative doctors.[7]  Further, the record does not establish any non-

17  exertional mental limitations.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  _____

26          [7]     The court notes that Dr. Roget – also a treating source – agreed with the agency
doctors that plaintiff could perform at least sedentary work.

1

**V.  CONCLUSION**

2      Based on the foregoing, the court concludes that the Commissioner's final

3  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

4  ORDERED that:

5          1.      Plaintiff's motion for summary judgment (Doc. 25) is denied;

6          2.      Defendant's cross-motion for summary judgment (Doc. 26) is granted; and

7          3.      The Clerk of the Court is directed to enter judgment and close this file.

8

9   DATED:  September 30, 2008

10                                          _____
                                            **CRAIG M. KELLISON**
11                                          UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26